GERSHOM LAMBERT *v*. WILLIAM HALL, SAMUEL W. HALL and others.

A. gave to B. a bond conditioned for the payment of $2,000 ; and on the same day executed to B. a writing purporting to be a mortgage to secure the payment of the said bond, referring to the bond, but no sum was stated in the said writing purporting to be a mortgage, the blank in which the sum should have been stated not being filled up. The execution of this writing was acknowledged before a proper officer ; and there was a certificate of the Clerk of the County indorsed thereon stating that it was recorded May 10. 1841. The registry of the mortgage, also, was blank as to the sum. Afterwards, there was attached to the page on which the registry was made a writing, dated June 28, 1841, signed by A., stating that the sum of $2,000 was omitted being inserted in the mortgage, and that the said sum should have been so inserted; and desiring that the mortgage might not lose its effect by the omission. In 1844, A. gave a mortgage on the same lands to C., who, previous to taking his mortgage, had examined the record of mortgages and found the record as above stated. C.'s mortgage was taken to secure an old debt from A. *Semble*, that the said writing executed to B. would be held to be a mortgage, and to have priority over the mortgage to C.

A. gave to B. a bond and a mortgage to secure the payment thereof; and subsequently gave a mortgage to C. on the same land. Afterwards, D., an uncle of A., paid, or handed to B. two several sums of money at two different times, taking loose receipts therefor on account of the said bond held by B., and afterwards a further sum as the balance in full on the said bond ; and, when the last of said sums was so paid or handed to B., the three sums were credited on the bond, the two first on account of the bond, and the last as the balance in full on the said bond ; and D. took no assignment of the said bond and mortgage given to B., or of either of them.

*Held*, under the proofs in the case, that the said bond and mortgage, in the hands of D., were not incumbrances as against the mortgage held by C.

The bill, filed Dec. 16, 1845, is exhibited by Gershom Lambert, for the foreclosure of a mortgage, dated January 29, 1844, given by William Hall and Catharine his wife to the complainant, to secure the payment of a bond of the same date given by Hall to the complainant, conditioned for the payment of $3,307 37 on or before Jan. 29, 1845, with lawful interest. The bill states that the mortgage was acknowledged on the said 29th of January, 1844, and that it was recorded in the Clerk's office of Hunterdon on the 30th of January, 1844. That on or about May 1, 1841, the said Hall and his said wife executed a mort-

gage on the same premises described in the complainant's mortgage, to one Hugh B. Ely, administrator &c. of John Wilson, deceased, which was recorded on the 11th of May, 1841, at six o'clock in the forenoon; but that the said mortgage to Ely, though drawn and written upon a printed blank mortgage, did not contain any mention of any sum of money to be secured thereby, nor any time of payment of any sum of money; and that the said mortgage was so recorded without the said record containing any sum of money to be secured, or time of payment; and that so the said record remained and still remains without any other record or thing to explain it.

That the complainant, or his agent or agents who transacted for him the business of his mortgage, previous to the execution of his mortgage, examined the records of mortgages for Hunterdon, for the purpose of ascertaining what incumbrances there were on the said premises, and found that the record of said Ely's mortgage was as above stated ; and being advised by his counsel that the said record was not according to the provisions of the statute in such case made and provided, and that the said mortgage was not an incumbrance on the premises, was induced to lend to the said Hall the said sum of $3,307 37, and to take as security therefor his said mortgage. The complainant submits that the said Ely mortgage is not an incumbrance on the premises, or, if an incumbrance at all, is not prior to the complainant's mortgage. And the bill charges, that the said Ely mortgage, though, as he insists, it was no incumbrance, was paid off by one Samuel Hall, an uncle or some other relative of the said William Hall, and by the said Ely given up or transferred to the said Samuel Hall ; by virtue whereof the said Samuel Hall, as the complainant is informed, claims some interest in the premises.

That on or about May 1, 1841, the said Wm. Hall and wife executed to Robert Ely, Smith Ely, George Ely, Mercer Ely and Gervaise Ely a mortgage on the same premises, to secure to them the payment of $2,000 ; which mortgage, as the complainant is informed and believes, was recorded in the Clerk's office of Hunterdon prior to the recording of the complainant's said mortgage, and was intended to be an incumbrance prior to the

complainant's mortgage, and is still outstanding, in the hands of the assignees of the Elys, as an incumbrance on the premises. That Tunis Huff is the assignee of the last mentioned mortgage.

That on the 10th of June, 1841, the said Wm. Hall and wife executed to one Samuel W. Hall a mortgage of the same premises, to secure to the said Samuel W. Hall the payment of $3,300, which, as the complainant is informed and believes, was recorded prior to the recording of the complainant's mortgage, and was intended to be an incumbrance prior thereto, and is still outstanding, in the hands of said Samuel W. Hall.

That on or about Dec. 29, 1842, the said Wm. Hall and wife executed to Samuel D. Stryker and James D. Stryker a mortgage of the same premises, to secure the payment of $2,000, which was recorded prior to the recording of the complainant's mortgage, and was intended to be an incumbrance prior thereto, and is still outstanding, in the hands of the said Strykers, as an incumbrance on the premises.

That on the 30th of January, 1844, after the execution and recording of the complainant's mortgage, the administrators of Joseph Hall, deceased, (naming them,) recovered a judgment in the Circuit Court of Hunterdon against the said Wm. Hall, for $551 45. That on the same day one Hugh B. Ely recovered a judgment against said Hall, in the Common Pleas of Hunterdon, for $1,597. That on the 1st of May, 1844, the Honesdale Bank recovered a judgment against the said Wm. Hall, in the Circuit Court of Hunterdon, for $200. That on the 10th of May aforesaid one Herman D. Gould recovered against said Hall a judgment in the Supreme Court, for $500. That on or about the 10th of August, in the year last aforesaid, Thos. Ridgeway and Henry Budd recovered a judgment against said Hall, in the Circuit Court of Hunterdon, for $480. That executions were issued on the said judgments, to the Sheriff of Hunterdon, who levied upon, advertised and sold the said mortgaged premises to James N. Reading and Hugh B. Ely; and on the 12th of June, 1845, executed to them a deed therefor.

William Hall and Catharine his wife, Samuel Hall, Tunis Huff, Samuel W. Hall, Samuel D. Stryker, James D. Stryker, James N. Reading and Hugh B. Ely are made defendants.

Samuel W. Hall put in his several answer. He admits the mortgage of the complainant. Admits that on the 1st of May, 1841, the said William Hall and wife executed a mortgage on the same premises to Hugh B. Ely, administrator of John Wilson, deceased, which was recorded on the 11th of May aforesaid, at 6 A. M. ; and that it was made and prepared upon a printed blank, and that it did not mention or specify any sum of money to be secured thereby, nor any time of payment, and that it was so registered without the registry thereof containing or setting forth any sum to be secured thereby ; but he denies that the said record remained and still remains without any other record or thing to explain it; and alleges the truth to be, as he is informed and believes, that very soon and in a few days after the said mortgage was registered as aforesaid, the fact that the sum of money intended to be secured by the said mortgage was not mentioned in the said mortgage and registry was discovered; and the same having been owing to an accidental omission or mistake in not filling up the blank at the time of the execution of the mortgage, he the said Hugh B. Ely procured from the said Wm. Hall a written instrument acknowledging the sum for which the said mortgage was given and which was intended to be inserted therein, it being $2,000 ; which said paper writing the said Hugh B. Ely procured to be attached to the registry of said mortgage as a notice to all persons, and especially to all subsequent purchasers and incumbrancers, that the said mortgage was given or intended to be given to secure the sum of $2,000.

He says he is informed and believes that, shortly before the giving of the said mortgage by said Hall and wife to said Ely, Hall had purchased of Ely, administrator as aforesaid, the property mentioned in the said mortgage, for a large amount of money ; and that the deed for the premises from Ely bore date and was given on the same day on which the said mortgage was dated and given, viz : May 1, 1841. That for $2,000 of the purchase money Hall gave to Ely, administrator as aforesaid, his bond, dated that day, conditioned for the payment of $2000, with interest, on the 1st of April ensuing ; and that to secure the said bond the said mortgage was prepared and given ; and that the omission to insert the amount in the said mortgage was accident-

al entirely. That as soon as it was discovered, means were taken, as above mentioned, to give notice to all persons interested or to become interested of the actual amount of the said incumbrance. He submits that, as the said mortgage of the said Ely was registered as aforesaid, with the paper writing or acknowledgment attached to the said record, long before the giving of the complainant's mortgage, the same was notice to the complainant with which he is in law affected.

He says that the sale of said premises, as made by Ely to Hall, was a matter of notoriety in the village of Lambertsville and the county or neighborhood around ; that the complainant then lived and had for many years lived about a mile or some short distance from said premises, and must therefore have known of said purchase and sale.

That he, this defendant, is informed and believes that the facts that the said mortgage was recorded without the sum being inserted, and that it was intended to secure $2,000, and that the said sum was a part of the purchase money for the said premises, were well and publicly known in the neighborhood, and especially to the complainant, before the date of his mortgage.

He submits that the record of the said mortgage, even without the acknowledgment or notice appended to the record, was sufficient to put the complainant on inquiry. That the premises conveyed by the said mortgage are described therein as the same premises which Ely, by deed bearing even date with the said mortgage, conveyed to said Hall immediately before the execution of the said mortgage.

That he is informed and believes, that this complainant, or his agent who transacted for him his business relative to his mortgage, before the execution thereof examined the records of mortgages for Hunterdon, and found that the mortgage given to Ely was recorded without setting out any sum of money or any time of payment or defeazance ; but he says he is informed and believes, that at the very time of the said examination the said Lambert, or his agent, was apprised of the said notice or acknowledgment attached to the said record as before mentioned ; that the same was seen, examined and spoken of at the time by the said Lambert or his agent, or spoken of by others in his pres-

ence ; and that the fact of the said mistake, and that the debt intended to be secured by the said mortgage was a debt of $2,000, was perfectly known and understood by the said Lambert, or his said agent, before the date of his mortgage.

That the said $2,000 mentioned in the said bond to Ely, and intended to be secured by the said mortgage to Ely, which bond and mortgage are now held by this defendant, was a part of the consideration of the said purchase. That, if the said mortgage should be considered invalid and insufficient, the said $2,000, being a part of the purchase money, was a lien on the said premises when the mortgage to the complainant was given ; and especially as against the complainant, who had notice of the said portion of the purchase money remaining unpaid.

He submits that his mortgage is entitled to priority according to its date, that being also the date of said purchase ; that the complainant had constructive and actual notice of the said mortgage, and of the nature and consideration thereof, and has no right or equity to defeat or postpone the said mortgage given to Ely.

He admits he is an uncle of Wm. Hall ; and that in May, 1844, he purchased of Ely the said bond and mortgage so given by his nephew, and that he has paid to Ely the full amount of the said bond, principal and interest; that the said bond and mortgage have been given up and transferred to him by the said Ely, and that he now holds the same as his own property. And this defendant further says, that the said bond and mortgage in his hands are in no wise paid off or satisfied to him by the said Hall or any other person; that the payments indorsed on the said bond as made by him to Ely were not made or received in extinguishment of the said bond, but as evidence that the consideration for the purchase money of the same was fully paid and satisfied by this defendant, who had become the purchaser and owner of the said bond and mortgage in good faith. And he submits that the said mortgage is a valid outstanding incumbrance upon the said premises, and is in equity entitled to be paid and satisfied out of the same.

He admits the mortgage from Hall and wife to the Elys, assigned to Tunis Huff. Admits that, on the 10th of June,

1841, Hall and wife executed to him, by the name of Sam'l W. Hall, a mortgage on the premises for $3,300, which was registered on the 11th of May, 1841 ; and which he alleges is an outstanding and valid mortgage. He admits the mortgage to the Stryker's ; and the judgments stated in the bill, and the sale of the premises under them.

Tunis Huff, the assignee of the mortgage stated in the bill, given by Hall and wife to Rob't Ely, Smith Ely and others, answered, setting out that mortgage.

James N. Reading and Hugh B. Ely filed a demurrer to the bill, which was overruled.

On the 19th of March, 1846, a decree *pro confesso* was taken against Sam'l D. Stryker and James D. Stryker, and against Wm. Hall and Catherine his wife and Hugh B. Ely, absent defendants.

*Joseph Besson*, sworn for the defendant, Sam'l W. Hall, testified.—That he is Clerk of Hunterdon County, and was sworn into office in March, 1845. P. I. Clark was Clerk from Jan'y, 1841, to Jan'y, 1842. Witness was a clerk for said Clark during that period. Exhibit No. 1 on the part of the defendant is a paper purporting to be an abstract of a mortgage given by Wm. Hall and wife to Hugh B. Ely, Administrator &c. of John Wilson, deceased, dated May 1, 1841. Exhibit No. 2 on the part of the defendant is a paper purporting to be a certificate by Wm. Hall that the mortgage was given for $2,000, bearing date June 28, 1841. Exhibit No. 1 is a true copy of the abstract of the mortgage. Exhibit No. 2 is a copy of a paper attached by a wafer to the page of the record on which the mortgage is recorded. I do not know when it was attached to the record. I have thought of it since I was spoken to about it. It was a considerable time after the mortgage was recorded. I had some doubt what to do with the paper when it was brought. I do not recollect the time when it was brought. I think I attached the paper to the record myself, at the request of the person who brought it. My impression is there were two of them who came to the office with the paper. I cannot state with any certainty the length of time the mortgage was recorded before the paper

was brought. I cannot tell the year, nor the time of the year when it was brought. Before the complainant took his mortgage on the same property I have no recollection of any search having been made by him or by any one for him.

*Cross Examined.* I don't know who the persons were that came to the office with the paper, or if I knew I have forgotten them. My impression is it was two or three years after the mortgage was recorded when that paper was brought to the office. I can't recollect the precise time. It was after the date of the paper Exhibit No. 2 that it was brought to the office. My mind is well made up that it was a long time after the mortgage was recorded. I think it was as much as two or three years afterwards; but I may be mistaken. I have a faint recollection of two men coming in with the paper. I think I told them, (as I usually do when papers are brought to the office that were not regular,) that it ought to have been acknowledged. They then, if I recollect right, requested me to attach it to the mortgage as it is. I do not recollect anything further about it in particular.

*Asher Lambert,* sworn for the complainant, testified as follows :—I am a son of the complainant. I resided with him, or he with me, in the township of Delaware. I was in the habit of doing my father's business for him during the last 20 years ; in the practice of attending to his money matters for him, as his agent. I had no written power of attorney to act as his agent. I attended to this matter of the complainant's mortgage now in dispute so far as to search the records of mortgages, &c. I think it was between the 20th and 25th or 26th of Jan'y, 1844, when I searched the records of mortgages in Hunterdon. It was in the week before the complainant's mortgage was given. Witness being shewn the record of mortgages, vol. 18, page 263, says, I examined at that time the abstract of defendant's mortgage there recorded as appears by Exhibit I. Before I examined the records Mr. Hall had promised to secure my father the payment of a certain sum of money by mortgage ; and my object in examining the record was to ascertain what incumbrances were on the property before we took our mortgage. The paper Exhibit No. 2, or the

original, was not there at that time. I heard tell of the said paper some time afterwards; and in examining the records some time afterwards for other purposes I saw it. The date of the mortgage to my father was, I think, Jan'y 29, 1844. The mortgage was executed on Monday before Court, Jan'y term, 1844. The amount of it was 3,307 37. My father, I think, was in his 90th year when the mortgage was executed. He was able to be about the house; he did not go out much. I do not know for what the defendant's mortgage was given. I know nothing about the mortgage except what appears on the record. I do not know that my father knew anything about it. I never heard him speak of such a mortgage; he intrusted the matter to me. I never heard either the mortgage or the amount spoken of previous to that time. My father knew nothing of it, according to my knowledge. If he had I think he would have told me; he and I acted as one in matters of business. We were in the habit of consulting each other in matters of business. We had no interest in each other's money matters; they were separate; we each had our own. I never examined the records but once, that I recollect, for the purpose above mentioned. I never was apprized in any way, at the time I examined the records, of the paper Exhibit No. 2, nor of any sum for defendant's mortgage. I saw it was blank and did not know the reason. I do not know that my father was apprized of the paper in any way. At the time of said execution of my father's mortgage I never heard Exhibit No. 2 spoken of in any way by others. I did not hear of it at all at the time the mortgage was executed to my father; not until some time after that.

*Cross Examined.* My father died March 1st, 1847. (This examination was on the 12th of that month.) He left a will, as is supposed. The will has not been opened. No letters, either of administration or testamentary, have been granted yet. At the time Mr. Hall proposed to give complainant a mortgage, he mentioned how many mortgages were on the property; but I don't recollect that he mentioned the amount. He said the property was good enough to secure ours yet. I understood that Hall bought the property of Dr. John Wilson, before his decease. I had not heard that Hall had paid Wilson for the property. My

father and I lived about two miles from the property at the time we took our mortgage. I don't recollect at what we valued the property at the time. I took the mortgage upon it. I don't recollect that I ever set any valuation on it; don't know that I ever heard any valuation set upon it. I examined the records to see what incumbrances there were on the property. I don't recollect how much I found on it; don't recollect at what sum I estimated the amount of the incumbrances; I have a paper somewhere which will shew it. I estimated the incumbrances at what they would amount to leaving out the blank mortgage of the defendant. I did not consider that any lien upon the property. I considered the bond good between the parties. I did not know whether the bond was blank or not. I inquired whether the bond was filled up or not, of Sam'l D. Stryker. He told me that he and H. B. Ely had talked about it, and Ely told him it was not blank, but was filled up afterwards. I did not inquire for what sum. I heard it talked about the village that it was for $2000. This conversation with Stryker was long after my father's mortgage was given; I think it was just before the sale by the Sheriff. At the time I searched the record, I inquired of [Mr. Besson, the Clerk, for how much that mortgage was given. He answered that it was said to be for $2000, but he did not know for how much. I did not inquire of any other person. I informed my father that I found such a mortgage on the record. He replied that it was put there to defraud. Neither of us took any legal advice about it before we took our mortgage. Don't recollect that we took any advice about it from any body. The reason I did not take any advice about the mortgage was, I looked at the law relating to mortgages, which says that the mortgagee shall specify the amount of the mortgage money, and I judged from that. I informed my father what the law was about it. I had heard of the Ely mortgage before Hall proposed to give my father this mortgage. Hall got the money of my father for which our mortgage was given, long before Hall bought the property of Dr. Wilson, or gave Ely the mortgage which defendant now holds. I had heard that the mortgage was for $2000 ; heard this also before our mortgage was given. Our mortgage was given to secure the money previously borrowed of my father, before Hall bought the

property on which our mortgage is. Some of the money loaned to Hall was as far back as 1832.' It was a bar-room and store talk, in and about Lambertville, about the Hugh B. Ely mortgage, both before and after my father took his mortgage, and that it was for $2000.

When, in my examination in chief, I said I did not know for what amount Hall's mortgage was given, I mean't to be understood as saying that I did not know from my own knowledge; not that I had not heard it talked about. I had heard it spoken of about the public stores and taverns as above related. I knew nothing of my own knowledge but what I saw on the record. Before I examined the record I had not heard that the mortgage was blank. After I examined the record my father and I talked about it's being blank, and being fraud. It was after that I heard it being talked about in the village that it was for $2000. I never heard of it's being blank until I examined the record. Before I had examined the record, I had heard it talked about that Ely had a mortgage against Hall in which it was said to be for $2000; but heard nothing said about a blank mortgage. I mean to say that I had heard it spoken of both before and after I searched the record, that is in this bar-room and store talk.

After searching the record I don't recollect that I enquired of Hall or H. B. Ely about it. I don't know that I ever mentioned to my father that H. B. Ely had a mortgage of $2000 until after my father took his mortgage; then I told him it was said to be for $2000. My father did not pay any attention to business; I attended to it for him.

*In Chief.* When Hall proposed to give the mortgage, he mentioned to me something about the different mortgages on the property, but I do not recollect what it was about, or nothing about it, it was so long ago. I did not pay much attention to what he told me. I depended upon the record. I can't state about mortgages he mentioned to me. I had determined to examine the record for myself, and therefore placed no reliance on what he said. I am not certain that I heard any thing about the Ely mortgage before I searched the record; it was a good while ago, and I did not charge my memory with it; but I stated from the best of my recollection.

I don't know now that I recollect of Hall's mentioning the Ely mortgage at the time he spoke of the different mortgages ; and perhaps he mentioned them all. I can't recollect. About the time of the sale there was a good deal of talk about the Ely mortgage. Some had one opinion about it and some another. Some thought it was done to defraud, and some thought otherwise. My father thought it was done to defraud, because, the sum being left blank, it might be filled up at any time and for any sum. I don't recollect Hall's saying any thing about the Ely bond and mortgage when he proposed to give a mortgage to my father. Hall said he would secure my father by a mortgage. Then I examined the record.

*James N. Reading,* sworn for defendant, testified. He is acquainted with the hand writing of Ezekiel Blue, the subscribing witness to the bond of Wm. Hall to Hugh B. Ely, administrator &c. of John Wilson, dated May 1, 1841, marked exhib. X., on the part of the defendants. That the signature of said Blue, as such subscribing witness, is his hand writing ; that the words " four thousand dollars" and " two thousand dollars" in the bond are in Blue's writing. That he is also acquainted with the handwriting of Wm. Hall, the obligor, and that the signature to the bond is his writing. (The mortgage given to secure this bond is exhibited.

*Hugh B. Ely* was examined by consent of parties, for the defendant, Sam'l W. Hall. He was acquainted with Wm. Hall ; has understood he was dead. It is said he removed to the Western country about two years ago. He owned a mill property in Lambertville. I held a mortgage on this property for him and his wife. My mortgage was for $2000. I think it was dated May 1, 1841. More than $2000 was due me from Wm. Hall when he gave the mortgage. For the balance over and above the mortgage he gave me his note. The mortgage and note were given for part of the purchase money of the mill property. It was due to me as administrator with the will annexed of John Wilson, deceased. At the same time that I took the mortgage I gave him a deed, as administrator as aforesaid, for the property ;

the deed bore the same date with the mortgage. After the mortgage was given I was informed that the consideration of $2000 had not been put in the mortgage. I supposed it had been done at the time of its execution. The sum was omitted by mistake. I took it for granted the sum was in. The bond and mortgage were all prepared except the sum. They were prepared by Judge Blue; after which they were brought to the house of Wm. Hall for execution, by Judge Blue. He inquired what sum he should insert in the bond and mortgage, and was told $2000. He then went to the table with the papers before him, and, as I supposed, filled the blanks in the bond and mortgage with $2000. I did not learn that the sum had been left out of the mortgage till some time after; not till after the mortgage had been taken to the Clerk's office to be recorded. On hearing of the omission I went to Flemington and found it to be so; after which I procured the signature of Wm. Hall to a paper which I drew up, stating, in substance, the true consideration of the mortgage. This paper, so signed, I caused to be appended to the record of the mortgage in the book of records. Exhib. No. 2, on the part of defendants, he has no doubt, is the paper he caused to be so appended. On getting this paper signed by Wm. Hall, I took measures to have it sent immediately to the Clerk's office. My impression is I left it with Wm. Hall, and that he promised to send it by his boy immediately. About the time when I discovered the omission and got this writing from Hall, I talked with various persons in Lambertville about my having a mortgage for $2000 on said mill property. Robt. Ely, one of the parties who held the next mortgage, frequently joked me about it; insisting that his mortgage was first, because of the omission in my mortgage. Robt. Ely had several interviews with me before my mortgage was given, wishing to have the first mortgage. This I did not agree to, and after we discovered the omission in my mortgage he pleased himself that he was first after all. I sold my mortgage to Saml. W. Hall. He paid me the full value for it, being the $2000, with the interest. Witness has no interest in the question between the parties in this cause in reference to this mortgage.

*Cross Examined.* The mill property was sold to Wm. Hall

some considerable time before I made a deed to him for it. John Wilson sold the property, in his life time, to Hall. Hall paid some on it and took possession in the life time of Wilson. I can't say how long it was before Wilson's death that Hall took possession; it was some considerable time; a year or more. Wilson died in Oct., 1835. The dwelling house and store house were on the property when Wilson sold it; I think so; I may be mistaken in this. The mill with the appurtenances were put up by Hall before the deed or mortgage was given. I should think that the mill and appurtenances put on the property by Hall were fully equal to the value of the property when sold by Wilson, and that these improvements were put on before my mortgage was given. The purchase money agreed upon between Hall and Wilson was somewhere between $8000 and $10,000. There was due on it at the death of Wilson somewhere between $6000 and $7000. At the time I took my mortgage, Wm. Hall told me the property stood him in over $30,000. When I took my mortgage I should have considered the property cheap at $20,000 or $25,000.

When Judge Blue had the bond and mortgage at Wm. Hall's, I looked at the bond and took it home with me. I was satisfied with the bond before. I heard of the omission in the mortgage. I did not take the mortgage with me; I left it with Hall, to be sent to the Clerk's office. I had every confidence in Hall. Hall and I agreed on the sum to be put in the mortgage, on the day it was executed. I had intended to have the whole sum put in, but was induced by Hall's promises to put in the sum as stated. I can't tell when the writing Exhib. 2 on the part of defendants got to Flemington. (The Clerk's office is at Flemington.) The persons I talked with in Lambertville about my mortgage, soon after the mortgage was given, were Dr. John Lilly, Samuel D. Stryker and others. It was no secret.

At the time I sold the mortgage to Sam'l W. Hall, he came to me and said he wanted to pay off that mortgage, or that he was going to make a payment; he wanted to take up that mortgage. I do not remember that I assigned the mortgage to him when the last payment was made. He did not wish any receipt on the bond, but wished a loose receipt; and when he made the last pay-

ment he gave up the loose receipt and I gave him the bond and mortgage. My impression is that I did not assign the mortgage.

*In Chief.* I do not remember the language used by Samuel W. Hall when he came to pay me money on the mortgage. I do not know what understanding there was between Wm. and Sam'l W. Hall as to paying off this mortgage. There was nothing said by Sam'l W. Hall from which I could infer that this mortgage was to be cancelled or that it was not to be cancelled, My impression was that Sam'l W. Hall, in taking up this mortgage, intended to take my place. This I gathered from the whole transaction, and not from any thing in particular said at the time by Sam'l W. Hall. There was a great deal said at the time which I cannot now particularly remember. At this time I wanted my money on the mortgage, and I had so informed Wm. Hall.

*Again Cross Examined.* When Sam'l W. Hall came there about this mortgage, I can't pretend to state the language he used ; but I understood from him that he came here to take up or pay off this mortgage. He first, perhaps, asked me if I did not hold such a mortgage against Wm. Hall ; said he had some money by him, he would pay that, and he would have some more by and by, and come over and pay it. He then said he would take loose receipts, and not have it receipted on the bond. This is all that I recollect of being said on this subject. Samuel W. Hall did not tell me his views in this transaction ; but I thought that his object was to take my place.

*In Chief.* When I use the words "pay or take up the mortgage," being the words attributed to Sam'l W. Hall, I did not understand that the mortgage was to be cancelled. There was nothing said like it or about it. My impression was that Sam'l. W. Hall was going to take my place ; but not from any thing he said, that I can recollect.

Exhib. No. 1, on the part of the defendants, being a copy of the abstract of the mortgage as it appears on the record, is as follows :

Wm. Hall and wife to Hugh B. Ely, Administrator of Dr.
   John Wilson, deceased.

Mortgage deed, made the 1st day of May, 1841, between Wil-
liam Hall, of Lambertville, in Amwell township, &c., and Cathe-
rine his wife, of the one part, and Hugh B Ely, Administrator,
with the will annexed of Doct. John Wilson, of &c., of the other
part. . Whereas the said William Hall, in and by a certain
obligation under his hand and seal duly executed, bearing even
date herewith, stands firmly bound unto the said Hugh B. Ely
in the sum of————————, lawful money &c., conditioned for
the payment of———————on the 1st day of April next ensuing
the date thereof, with lawful interest for the same : Now, this
Indenture witnesseth &c., for all that certain &c., (describing
the premises.)   And it is the same premises which the said Hugh
B. Ely, in a deed bearing even date herewith, granted and con-
firmed to the said William Hall immediately before the execution
hereof.   Together &c.   To Have &c.   Provided &c.

                        W. HALL,   [L. S.]
                CATHERINE ANN HALL,   [L. S.]
Sealed &c. in the presence of Ezekiel Blue.

Acknowledged &c.   Recorded May 11, 1841.   Exhibit No.
2 on the part of the defendant is as follows : Whereas I, Wm.
Hall, of &c., did, on the 1st day of May last, execute a mort-
gage, with bond and warrant of Attorney, to Hugh B. Ely,
Administrator &c. of the estate of Dr. J. Wilson, deceased, for
the payment of $2,000 on the 1st day of April next, with lawful
interest :   Now, know ye who it may concern, that the said sum
of $2,000 was omitted being inserted in the said mortgage.   I
do hereby certify that the said sum of $2,000 should have been
inserted, and I desire that it may not lose its effect by the omis-
sion.   Witness my hand and seal this 28th day of June, A. D.
1841.                               W. HALL,   [Scroll.]
Witness present, Thos. J. Shreeve.

There is no assignment to Sam'l W. Hall of the mortgage from
Wm. Hall and wife to Hugh B. Ely.   The indorsements of pay-
ments on this bond are as follows :

                            27

[$800]   Received, May 6, 1844, of Sam'l W. Hall eight hundred dollars on account of this bond.

H. B. ELY, *Adm'r.*

[$665]   Received, May 21, 1844, of Sam'l W. Hall six hundred and sixty-five dollars on account of this bond.

H. B. ELY, *Adm'r.*

[$929,09]   Received, April 21, 1845, nine hundred and twenty-nine dollars and nine cents, balance in full on this bond.

H. B. ELY, *Adm'r.*

The bond and mortgage from Wm. Hall and wife to Sam'l W. Hall are dated June 10, 1841 and are conditioned the payment of $3,300, on the first day of May thereafter, with interest from the first of May, 1841.   This mortgage was acknowledged June 10, 1841, and recorded June 11, 1841.

There is a credit on this bond as follows : " May 1, 1842, received on the within the interest in full by me.

SAM'L W. HALL."

*J. H. Wakefield* and *A. Wurts,* for the complainant.   They cited 4 *Kent's Com.* 134, 154; *Rev. Stat.* 657; *Halst. Dig.* 627; 2 *Green's Ch. Rep.* 43; 47 *Law Lib.* 55; *Rev. Stat.* 644; 1 *John. Ch.* 299; *Saxton's Ch.* 205; 7 *Wheat.* 446; *Bin. Rep.* 40; 3 *Cranch* 140; 2 *Cowen* 246, 296.

*P. D. Vroom,* for the defendant, *Samuel W. Hall.*   He cited 1 *John. Ch.* 300; 8 *Cowen* 262; 2 *Green's Ch.* 397; 47 *Law Lib.* 89, 15; 5 *Price* 306; 3 *Mylne & Keen* 699; 3 *Green's Ch.* 173.

THE CHANCELLOR.   Wm. Hall executed and delivered on the 1st May, 1841, to Hugh B. Ely, administrator &c., of Dr. John Wilson, deceased, a bond in the penal sum of $4000, conditioned for the payment of $2000, on the 1st of April thereafter, with lawful interest.

On the same day, William Hall and Catharine Ann his wife

signed, sealed and delivered to the said Hugh B. Ely, administrator as aforesaid, a writing purporting to be a mortgage on lands therein described. This writing states, that, whereas the said Wm. Hall, in and by a certain obligation under his hand and seal, duly executed, bearing even date therewith, stands firmly bound unto the said Hugh B. Ely, in the sum of ————, lawful money, conditioned for the payment of ———— in like money, on the first day of April next ensuing the date thereof, with lawful interest for the same, as in and by the said recited obligation and the condition thereof, relation thereto being had, may more fully and at large appear. Now this indenture witnesseth that the said Wm. Hall and Catharine Ann his wife, as well for and in consideration of the aforesaid debt or sum of [blank,] and for better securing the payment of the same, with interest, unto the said Hugh B. Ely, in discharge of the said recited obligation, as of the sum of one dollar to them paid by said Ely, (the writing then conveys the premises therein described to the said Ely, and states that they are the same premises which the said Ely, by deed bearing even date therewith, conveyed to the said Wm. Hall, immediately before the execution thereof.) Provided, nevertheless, that if the said Wm. Hall, his heirs, &c., shall well and truly pay to the said Hugh B. Ely, his executors, &c., the aforesaid debt or sum of ————, on the day and time herein before mentioned for the payment thereof, with interest for the same, according to the condition of the said recited obligation, this indenture and the said recited obligation to be void. This writing was signed and sealed in the presence of Ezekiel Blue, the subscribing witness, and was acknowledged before him as a Judge &c. ; and there is indorsed thereon, a certificate of the Clerk of the Co. of Hunterdon that it was received in his office on the 11th of May, 1841, and recorded in vol. 18 of mortgages, fol. 263 and 4.

The registry of the said writing in the Clerk's office is as follows, viz :

Wm. Hall and Wife, to Hugh B. Ely, administrator &c. of Dr. John Wilson, deceased.

Mortgage deed made the first day of May, 1841, between Wm.

Hall, of Lambertville, in Amwell township, Hunterdon county, and State of New Jersey, and Catharine his wife, of the one part, and Hugh B. Ely administrator &c. of Dr. John Wilson, deceased, of the other part. Whereas the said Wm. Hall, in and by a certain obligation under his hand and seal duly executed, bearing even date herewith, stands firmly bound unto the said Hugh B. Ely, in the sum of ———, lawful money &c., conditioned for the payment of ———, on the first day of April next ensuing the date thereof, with lawful interest.

Now this indenture witnes seth &c., for all that certain &c., (describing the premises;) and it is the same premises which the said Ely, in a deed bearing even date herewith, granted and confirmed unto the said Wm. Hall, immediately before the execution thereof. To have and to hold &c. Provided when paid to be void &c. .

WM. HALL, [L. s.]<br>CATHARINE ANN HALL, [L. s.]

Sealed &c., in the presence of EZEKIEL BLUE.

Acknowledged May 7, 1841, before Ezekiel Blue, Judge &c. Recorded May 1, 1841, 6 A. M.

There is now attached to the page on which this registry is made a writing of which the following is a copy : " Whereas I, Wm. Hall, of Lambertville &c., did, on the first day of May last, execute a mortgage with bond and warrant of Attorney to Hugh B. Ely, administrator &c. of the estate of Dr. John Wilson, deceased, for the payment of $2000 on the 1st day of April next, with lawful interest. Now know ye who it may concern, that the said sum of $2000 was omitted being inserted in the said mortgage. I do hereby certify that the said sum of $2000 should have been so inserted ; and I desire that it may not lose its effect by the omission. Witness my hand, &c., June 28th, 1841.

W. HALL, [L. s.]

THOS. J. SHREEVE, witness present.

On the 29th Jan., 1844, Wm. Hall gave a bond to Gershom Lambert, the complainant, for $3307,37 ; and to secure this bond the said Wm. Hall and Catharine his wife, on the same day,

executed and delivered to the complainant a mortgage, of that date, on the same premises described in the said writing purporting to be a mortgage from the said Wm. Hall and wife to the said Hugh B. Ely.

On the 1st May, 1841, the said Wm. Hall and wife executed and delivered to Robert Ely, Smith Ely and others, a mortgage of the same premises to secure $2000; which was recorded prior to the complainants mortgage, and which has been assigned to Tunis Huff.

On 10th June, 1841, the said Wm. Hall and wife executed and delivered to Samuel W. Hall a mortgage of the same premises, to secure $3300, which was recorded June 11, 1841.

On the 29th December, 1842, the said Wm. Hall and wife executed and delivered to Sam'l D. Stryker and Jas. D. Stryker a mortgage of the same premises, to secure $2000; which was recorded prior to complainant's mortgage.

After the execution and recording of the complainant's mortgage, several judgments at law were recovered against the said Wm. Hall; by virtue of which and of executions issued thereon, the mortgaged premises were sold by the sheriff of Hunterdon to Jas. N. Reading and Hugh B. Ely, and conveyed by him to them.

Gershom Lambert exhibited his bill to foreclose his said mortgage given by Wm. Hall and wife to him on the 29th January, 1844, making Wm. Hall and his wife, Samuel W. Hall, Tunis Huff, Sam'l D. Stryker, Jas. D. Stryker, Jas. N. Reading and Hugh B. Ely defendants.

The bill states that the said mortgage to Hugh B. Ely, recorded May 11, 1841, was written on a printed blank, and does not contain any sum of money to be secured thereby, nor any time of payment; and that the registry thereof contains no sum of money to be secured thereby, nor time of payment.

That the complainant, or his agent who transacted the business of his mortgage for him, previous to the execution of his mortgage examined the records of mortgages for Hunterdon, for the purpose of ascertaining what incumbrances there were on the said premises, and found that the record of said Ely's mortgage was as above stated; and being advised by his counsel that the said record was not according to the provisions of the statute

in such case made and provided, and that said mortgage was not an incumbrance on the premises, he was induced to lend to the said Hall the said sum of $3,307 37, and take his said mortgage as security therefor.    The bill charges, that the said Ely's mortgage, though, as the complainant insists, it was no incumbrance, was paid off by Sam'l W. Hall, who is an uncle of the said Wm. Hall, and by the said Ely given up or transferred to the said Sam'l W. Hall.    It appears clearly from the testimony taken in the cause, that the mortgage from Wm. Hall and wife to the complainant was not given to secure any money then lent or advanced, but to secure a precedent debt.

[The Chancellor then recites the evidence of *Jos.* Besson, Hugh B. Ely and Asher Lambert.    And speaking of Lambert, the Chancellor goes on to say:]

This witness, in his cross examination, after stating that he inquired of Besson for how much the Ely mortgage was given and the answer he got, and that he informed his father that he found such a mortgage on the record, says : " Neither of us took any advice before we took our mortgage.    The reason was, I looked at the law relating to mortgages which says that the mortgage shall specify the amount of the mortgage money ; and I judged from that.    I informed my father what the law was about it."    The 5th section of our statute, entitled " An Act to register mortgages," enacts, that every mortgage shall be void against a subsequent judgment creditor or bona fide purchaser or mortgagee *not having notice thereof,* unless acknowledged or proved and recorded &c.

If a subsequent mortgagee has actual notice of a prior mortgage, his mortgage will be postponed to that prior mortgage, though that be not recorded.

I am of opinion, clearly, from the evidence, that the complainant is chargeable with actual notice that Wm. Hall had given a mortgage to Hugh B. Ely before he, the complainant, took his mortgage, independent of the certificate appended to the record of the Ely mortgage.

The complainant did not know or discover that the Ely mort-

gage was in blank as to sum till it was found to be so by his son
in searching the records.   The complainant advanced no money
for the mortgage given to him.   Hall proposed to give it to secure
an old debt he owed the complainant, and the complainant could
have no objection to taking it.   He had full notice of the Ely
mortgage, *if it be a mortgage,* i. e. he.had notice of the paper as
it actually was.

The bill charges that the mortgage to Hugh B. Ely was paid
off by Sam'l W. Hall, an uncle of the mortgagor, Wm. Hall,
and by the said Ely given up or transferred to him.

The bond and mortgage from Wm. Hall and wife to Ely were
exhibited in the cause.   There is no assignment of them, or
either of them, to Sam'l W. Hall or any other person.   The
indorsements of payments on this bond are as follows, viz :

[$800]   Received, May 6, 1844, of Samuel W. Hall, eight
hundred dollars on account of this bond.

H. B. ELY, *Adm'r.*

[$665]   Received, May 21, 1844, of Sam'l W. Hall, six hun-
dred and sixty-five dollars on account of this bond.

H. B. ELY, *Adm'r.*

[$929  09]   Received, April 21, 1845, nine hundred and twenty-
nine dollars and nine cents, balance in full on this bond.

H. B. ELY, *Adm'r.*

In response to the charge in the bill that the Hugh B. Ely
mortgage has been paid &c., the answer of Sam'l W. Hall says,
" He admits he is an uncle of Wm. Hall, and that in May, 1844,
he purchased of Ely the said bond and mortgage so given by his
nephew, and that he has paid to Ely the full amount of the said
bond, principal and interest.   That the said bond and mortgage
have been given up and transferred to him by the said Ely, and
that he now holds the same as his own property.

The answer then proceeds thus : " And this defendant further
says, that the said bond and mortgage in his hands are in no wise
paid off or satisfied to him by the said Wm. Hall or any other

person. That the payments indorsed on the said bond as made by him to Ely were not made or received in extinguishment of the said bond, but as evidence that the consideration for the purchase money of the same was fully paid and satisfied by this defendant, who had become the purchaser and owner of the said bond and mortgage in good faith. And he submits that the said mortgage is a valid outstanding incumbrance upon the said premises, and is in equity entitled to be paid out of the same." He admits that on the 10th of June, 1841, Wm. Hall and wife executed to him a mortgage on the premises for $3,300, which was registered on the 11th of May, 1841, and which he alleges is an outstanding and valid mortgage. Hugh B. Ely, in his principal examination, says, he sold his mortgage to Sam'l W. Hall. In his cross examination he says, " At the time I sold the mortgage to Sam'l W. Hall he came to me and said he wanted to pay off that mortgage, or that he was going to make a payment ; he wanted to take up that mortgage. He did not wish any receipt on his bond, but wished a loose receipt; and when he made the last payment he gave up the loose receipts and I gave him the bond and mortgage. My impression is that I did not assign the mortgage." Examined in chief again, he says :

" I do not remember the language used by Sam'l W. Hall, when he came to pay me money on the mortgage. I do not know what understanding there was between William and Samuel W. Hall as to paying off this mortgage. There was nothing said by Sam'l W. Hall from which I could infer that this mortgage was to be cancelled or that it was not to be cancelled. My impression was that Sam'l W. Hall, in taking up this mortgage, intended to take my place. This I gathered from the whole transaction, and not from any thing in particular said at the time by Samuel W. Hall. There was a great deal said at the time which I cannot now particularly remember. At this time I wanted my money on the mortgage, and so had informed Wm. Hall.

*Again Cross Examined.* He says, " when Sam'l W. Hall came there about this mortgage, I can't pretend to state the language he used, but I understood from him that he came to take up or pay off this mortgage. He first, perhaps, asked me if I did

not hold such a mortgage against Wm. Hall, and said he had some money by him, and would pay that, and would have some more by and by and come over and pay it. He then said he would take loose receipts, and not have it receipted on the bond. This is all I recollect being said on this subject. Sam'l W. Hall did not tell me his views in this transaction; but I thought his object was to take my place.

*In Chief Again.*  When I use the words " pay or take up the mortgage," being the words attributed to Sam'l W. Hall, I did not understand that the mortgage was to be canceled. There was nothing said like it or about it. My impression was that Sam'l W. Hall was going to take my place, but not from anything he said, that I can recollect.

The peculiarity of the answer of Sam'l W. Hall, in answer to the charge that this mortgage had been paid off, and the testimony of Ely on that part of the case, connected with the fact that the mortgage is receipted in full, the indorsement of the last payment in full not even mentioning by whom it was made, and no assignment of the bond and mortgage or either of them being made to Sam'l W. Hall, presents a case so singular, so utterly variant from the course which would naturally have been pursued by one intending to buy a mortgage and hold it as an existing instrument and lien, that I am constrained to say that, in my opinion, no such intention existed. No man of common prudence, intending to buy a mortgage, would pursue such a course. Again, the mortgage was in blank as to sum; no amount of money was mentioned in it. Can it be believed that any man about to invest money, his own money, unless he was otherwise secured for it, would not only run the risk of buying a mortgage blank as to sum, but would buy it without taking an assignment of it or of the bond; and that, too, though there were payments indorsed on the bond, the last of which indorsements was a general receipt in full, without stating by whose hands the money was paid, and therefore carrying the presumption that it was paid by the obligor himself? The indorsements made by Ely on the bond, particularly the last, shows that it was his understanding that the mortgage was paid off; and this is more consistent with his tss-

timony as to what passed between him and Sam'l W. Hall than any other version of it.

A man is not at liberty to put a court to guess that he had a meaning different from what the facts fairly show according to all the rules of dealing between men of ordinary prudence, and on such a guess to make out an affirmative case for him.

The court is asked to declare, under the facts above stated, that when this bond and mortgage was paid off and receipted in full, in the manner stated, and no assignment of them or either of them taken, Sam'l W. Hall supposed and intended them to be, in his hands, subsisting instruments. I do not believe it. If he did, and loss accrues to him, it is fairly chargeable to his own folly or stupidity. To encourage such looseness and disregard for what prudence dictates to any man in reference to his rights and interests would fill the courts with controversies. True, it now appears, by the testimony in this cause, that the last money was also paid by him, or his hand; but this does not change the view taken as to his intention at the time. He paid it on the bond, and it was indorsed on the bond. The indorsement is of a gen eral receipt in full of the balance due on the bond; and he took no assignment or any thing else to show that he had any right or interest in the bond and mortgage. It can hardly be supposed that if he intended to keep this bond and mortgage alive, as securities for money of his own, he would have committed all his interest to the chance of proving by parol, at a future day, that the money indorsed as payment in full was paid by him.

This renders it unnecessary to consider in this suit, whether the writing given by Wm. Hall and wife to Hugh B. Ely, purporting to be a mortgage, is to be considered a mortgage, there being no sum mentioned in it. It is for the payment of (blank,) according to the condition of a certain bond, dated May 1, 1841, given by Wm. Hall to Hugh B. Ely, payable on the 1st day of April next ensuing the date of said bond, with interest. I am inclined to think it should be considered a mortgage to secure the sum mentioned in that bond. The sum can be ascertained from the bond.

For the purposes of this suit, the Hugh B. Ely mortgage will be declared to be postponed to all the other mortgages.

It is possible that something may have occurred which might induce the Court to consider this bond and mortgage as still an existing security, in the hands of Samuel W. Hall, as against the purchasers at the sheriff's sale.  Sam'l W. Hall and the said purchasers are defendants in this cause ; but their respecttvc rights, as between them, could not well be submitted or adjudged in it.  I am willing that, if the property shall sell for more than the other mortgages, the surplus be brought into court, that the right to it, or enough of it to meet the Hugh B. Ely mortgage, may be contested between Sam'l W. Hall and the said purchasers.

I had gone thus far, when, at Dec. term, 1847, without reading the above, I stated to counsel that I was willing to hear any further testimony they might obtain, and which might throw light upon the question whether the bond and mortgage must not be considered as paid, or whether, in the present shape of the papers, the bond and mortgage are to be considered as subsisting instruments.

One further deposition has since been put in on the part of the defendant, Samuel W. Hall.  It is that of Samuel Hall, a nephew of defendant and brother of Wm. Hall.

[The Chancellor here recites in full the testimony of Samuel Hall, and proceeds as follows :]

So much of this deposition as may be considered testimony, and not the impressions or opinions of the witness, is : he knows of Samuel W. Hall getting a bond and mortgage from Ely.  That Samuel W. Hall paid to Mr. Ely the amount of principal and interest due on the bond and mortgage, in three payments.  Wm. Hall came and applied to his uncle to get the money to settle up this bond and mortgage.  Nothing was said about the sum not being mentioned in the mortgage when William asked his uncle to pay it off.  Mr. Hall, [Sam'l W. Hall] said he would pay it off from time to time as he could get the money.

The rest of the deposition, (except as herein after noticed,) consists of impressions or inferences of the witness, as follows : he (Samuel W. Hall,) took that mortgage in preference to taking a new one, because it was the first mortgage.  His uncle took

the bond and mortgage from Mr. Ely as security for the money which he had advanced for William Hall. He took it as security for the money, holding the property liable to him for the money. He mean't to take up the bond and mortgage for himself. Such expressions as these can have no influence. The fact that the bond was indorsed as paid in full, the last indorsement not stating by whom that payment was made, is of itself much stronger than any such impressions or opinions of the witness. The remaining parts of this deposition to be noticed are as follows : witness was there the last time when his uncle took up the bond and mortgage. It was spoken then about an assignment on the bond and mortgage ; but Mr. Ely did not think it was necessary to make an assignment on them. Mr. Ely thought the face of the bond would be enough at any time to show he had paid the money. He thought his holding of it would be sufficient, and that it would not require an assignment.

Wm. Ely, in his testimony, says, that when Samuel W. Hall came to him he said he wanted to pay off the mortgage, or that he was going to make a paymént, he wanted to take up the mortgage. There was nothing said by Samuel W. Hall from which he could infer that the mortgage was to be canceled or that it was not to be canceled. When Samuel Hall came, witness understood from him that he came to take up and pay off the mortgage. He said he had some money by him, he would pay that, and he would have some more by and by, and come over and pay it. This is all he recollects being said on the subject. Samuel W. Hall did not tell him his views on the transaction.

The transaction as actually carried out was consistent with the language used by Samuel W. Hall : the payments were indorsed on the bond and the bond receipted in full.

It is difficult to imagine that, if Samuel W. Hall intended to become the assignee of the bond and mortgage, he would have allowed the bond to be receipted in full ; and quite as difficult to imagine that, if an assignment was spoken of, in such a way as to give Mr. Ely the idea that Samuel W. Hall intended to become the assignee of the bond and mortgage and to hold them as subsisting securities, Mr. Ely should have thought that

the indorsing of the bond as paid in full would make him such assignee.

Mr. Ely states no such thing in his testimony : and Samuel W. Hall in his answer makes no such pretension.

There is but a single remark in the testimony of Samuel Hall going *to show that* Samuel W. Hall said one word that indicated an intention of getting these papers in such way as to hold them as subsisting securities ; and this does not occur in the principal examination of this witness, and the witness fixes it, too, at the first time they went to Ely's.   The witness says, that his uncle said to Mr. Ely, the first time they were there, that he would take the bond and mortgage as security for the money he would advance.    Mr. Ely makes no statement that he intended to take an assignment of the mortgage ; or that he was ignorant that an assignment was necessary ; or that he supposed that indorsing the bond paid by him was sufficient to put him in the position of an assignee.    Indeed, the last indorsement does not even show that the money thereby credited on the bond, and paying it in full, was paid by him.    To make out the case now set up by or for the defendant Samuel W. Hall, if the case really was as now contended, for the purpose of overcoming the strong, not to say plenary proof, derived from the fact that the bond is indorsed paid in full, we should have had, I have no doubt, an entirely different answer.    The case as now contended for could not exist without a degree of ignorance in both Samuel W. Hall and Ely, nay, in Samuel Hall too, which the court are not at liberty to presume.

If the transaction was really intended to be an assignment, but took the shape it did from ignorance, the only way in which it could have happened, it would have been so stated in the answer of Samuel W. Hall.

He does not put himself on this ground.   Unless, therefore, we are at liberty, in the absence of any such ground taken in the answer, to presume that it was through ignorance, there is nothing to overcome the proof furnished by the indorsements themselves ; for if we presume, or take it for granted, that either of these three men knew that an assignment was necessary, the payments would never have been indorsed on the bond.

In the absence of any allegation of such ignorance, I cannot assume it; but must give effect to the transaction as it appears upon the papers. It would be dangerous, when a bond, by indorsements, is shown to be absolutely paid, for a court to set it up as a subsisting obligation. What do the court know of the motives of the parties at the time of the transaction, arising from relationship or from the state of dealings between them? Many reasons may have existed why this uncle may have been willing to pay the bond; and dealings may have been had between him and his nephew since, founded on this very payment.

Would the court be safe now, in giving to a transaction an entirely different character from what the parties, by their own acts at the time, gave it? Safe in saying that a sum of money indorsed on a bond as a payment was no payment? That a receipt in full on a bond was no payment?

Could an action at law be brought on this bond, receipted in full? I apprehend not.

Assumpsit might be brought for money paid at the request of Wm. Hall in discharge of his bond; but the mortgage accompanying the bond would not be a subsisting incumbrance. The indorsements on the bond, in this case, are, in my judgment, stronger evidences of what was the intention of the parties than anything to be derived either from the answer or the testimony in the cause.

In this view of the case, I think it unnecessary to consider whether a writing purporting to be a mortgage, but which contains no sum of money nor time of payment is a mortgage. An abstract of this writing was recorded. The abstract was blank as to sum and time of payment. A person seeing such an abstract would learn that some such writing existed. He would not know whether the omitting to fill the blank was a mistake of the recording clerk, or whether the writing itself, in the possession of the party holding it, was blank. If we suppose the abstract sufficient to put him upon inquiry, and suppose him to have inquired and found that the writing itself was blank, and that the omission to fill the blank was a mistake in the execution of the mortgage, what is the effect? Or if he makes no inquiry, but the writing is in fact blank, in which case notice, if we suppose

such an abstract or record sufficient to put him on inquiry, would be according to the fact, that is, notice of a mortgage blank as to sum, what is the effect? Is such a blank writing and the recorded abstract of such a blank writing a valid mortgage for the sum that was intended to be put in the mortgage?

Our "Act to register mortgages" provides, that the recording clerk shall enter the names of the mortgagor and mortgagee, the date of the mortgage, the mortgage money and when payable, and the description of the lands mortgaged. And a supplement to the said act provides, that every mortgage shall be void against a subsequent judgment creditor or bona fide purchaser or mortgagee for a valuable consideration not having notice thereof, unless such mortgage shall be acknowledged, or proved, and recorded.

Under these sections, is the record of an abstract, without sum, of a writing purporting to be a mortgage, which in truth has no sum, notice of a mortgage for any sum whatever?

The question is new, and perhaps there are difficulties in it. It is not the case of a mistake in the recording clerk. It is a case of oversight in the party taking the mortgage.

It, perhaps, would be considered his own laches, of a character from which a court might not feel bound or disposed to relieve him by any strained view of equity. On the other hand, it may be said that by inquiring of the holder he might learn that the mortgage was to secure a bond of even date with the mortgage and between the same parties, and that the bond contained the sum. Still the question recurs, is it a mortgage? It might on a bill in equity between the parties be established as a mortgage; but is it a mortgage as against a subsequent mortgagee taking a mortgage before it is established in equity?

I have not found it necessary in this case to decide this question.

The Ely mortgage will be postponed to the complainant's mortgage and to the other mortgage.

Decree accordingly.